## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

ANITA LOYD
      Plaintiff

v.                                         Case No:
                                               HON:

ST JOSEPH MERCY OAKLAND/TRINITY HEALTH
SJMO PUBLIC SAFETY DEPARTMENT
RYAN HERNANDEZ, SJMO Human Resources Officer
STEPHEN KAZIMER, SJMO Security Supervisor
MARK BOTT, SJMO ER-Nurse
DAVE SIKORSKI, Public Safety Officer

      Defendants

_____/

Joseph Ozormoor (P42462)          Defendants Address:
LAW OFFICE OF JOSEPH T. OZORMOOR     44405 Woodward Avenue
Attorney for Plaintiff              Pontiac, MI 48341-2985
469 LaBelle Road
Grosse Pte. Farms, MI  48236
(313) 924-5319
(313) 432-7840 fax
jtozormoor@comcast.net

_____/

## COMPLAINT AND JURY DEMAND

Plaintiff, ANITA LOYD, by and through her undersigned counsel, Joseph Ozormoor of the LAW OFFICES OF JOSEPH T. OZORMOOR, complains against Defendants, ST JOSEPH MERCY OAKLAND/TRINITY HEALTH, RYAN HERNANDEZ, STEPHEN KAZIMER, GREG WILLIAMS, MARK BOTT, and DAVE SIKORSKI as follows:

### ALLEGATION OF JURISDICTION AND VENUE

1. This is an action to vindicate violations of Plaintiff's civil rights and to redress the unlawful and discriminatory conduct and employment practices of the Defendants. The action arises out of the unlawful and wrongful discharge of Plaintiff from her

employment with the Defendant employer on July 1, 2011 based, in whole or in part, upon her age, race and/or gender in violation of the Age Discrimination in Employment Act (ADEA), 29 U.S.C. §621 et seq., Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e et seq., and the Civil Rights Act of 1991, 42 U.S.C. §1981a.

2.      This action is also being brought under the State of Michigan Elliott-Larsen Civil Rights Act, MCL 37.2101 et seq., and Michigan common law for interference with contractual employment relationship and intentional infliction of emotional distress.

3.      This Court has jurisdiction in this action pursuant to 42 U.S.C. §2000e-5 and §2000e-16(c), and the general civil rights jurisdictional provision of 28 U.S.C. §§ 1331 and 1343(a)(4).

4.      This Court's jurisdiction is also invoked in this action over the state law claims pursuant to the supplemental jurisdiction provision of 28 U.S.C. §1367.

5.      The events giving to this action occurred in the Eastern District of Michigan.

6.      The amount in controversy exceeds $75,000.

7.      Plaintiff has complied with all the administrative prerequisites to action under Section 706 of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C 2000e-5 as follows:

A:      On or about September 9, 2011, Plaintiff timely filed a charge of age discrimination, race discrimination and sex discrimination with the Michigan Department of Civil Rights (MDCR) which was jointly filed with the Equal Employment Opportunity Commission (EEOC), Case # 471-2011-03355, **Exhibit 1**;

B.      Plaintiff promptly and diligently accommodated all MDCR and EEOC requests for information and fully cooperated in agency investigation of this matter;

2

C.    Plaintiff has exhausted all available administrative remedies in accord with the aforementioned statutes prior to bringing this action, and brings this action within 90 days of receiving her Notice of Right to Sue from the EEOC on March 22, 2012, **Exhibit 1**.


## RELIEF SOUGHT

8.    Plaintiff seeks vindication of the violations of her civil rights and redress for the unlawful and discriminatory employment practices and conduct of the Defendants.

9.    Plaintiff seeks a declaration that the Defendants intentionally and unlawfully discriminated against her because of her race, age, and/or gender, appropriate injunctive relief, lost pay, compensatory and punitive damages, court costs, and attorney fees.

## THE PARTIES

10.    Plaintiff Anita Loyd (hereinafter "Plaintiff" ) is a 52-year old African American citizen of the United States,  residing in the City of Detroit, Wayne County, Michigan.

11.    Upon information and belief, Defendant Saint Joseph Mercy Oakland/Trinity Health (hereinafter "SJMO" ) is a general medical and teaching hospital in Pontiac, Oakland County, Michigan and a subsidiary of Trinity Health Care System, and has its address at 44405 Woodward Avenue, Pontiac, MI 48341-2985.

12.    Defendant SJMO Public Safety Department (hereinafter "SJMO" or "safety department" is a unit and integral part of SJMO that provides and enforces public security inside and around SJMO hospital campus.

13.    Upon information and belief, Defendant Ryan Hernandez (hereinafter Defendant "Hernandez") at all material times was Defendant SJMO's Human Resources business officer ("HR officer"), and has his address at 44405 Woodward Ave, Pontiac, MI 48341

14.     Upon information and belief, Defendant Stephen Kazimer (hereinafter "Kazimer") at all material times was SJMO Public Safety Department supervisor, and has his address at 44405 Woodward Avenue, Pontiac, MI. 48341-2985.

15.     Upon information and belief, Defendant Greg Williams(hereinafter "Defendant Williams" ) at all material times was SJMO Public Safety Department supervisor, and has his address at 44405 Woodward Avenue, Pontiac, MI. 48341-2985.

16.     Upon information and belief, Defendant MARK BOTT (hereinafter "Defendant Bott" or "RN Bott") at all material times was a Registered Nurse in the Emergency Department at SJMO, and has address at 44405 Woodward Ave, Pontiac, MI. 48341.

17.     Upon information and belief, Defendant Dave Sikorski (hereinafter "Defendant Sikorski" or "Officer Sikorski") at all material times was a Public Safety Officer in the Public Safety Department at SJMO, of address 44405 Woodward, Pontiac, MI. 48341.

18.     The individual Defendants in this action are sued in their individual, agency and official capacities.

19.     At all times relevant in this action, Defendant SJMO was liable pursuant to principles of respondeat superior and vicarious liability for the actions of its officers, agents and employees committed in the course of their employment.


**BACKGROUND FACTS**

20.     Plaintiff was employed by Defendant SJMO for twenty five (25) years as a security officer (officer) in its Public Safety Department ( "safety department") from June 10, 1986 until her wrongful and unlawful discharge on July 1, 2011.

21.     At the time of her wrongful and unlawful discharge on July 1, 2011, Plaintiff was 51 years old and the most senior and veteran security specialist in the safety department, trained in and familiar with the processes and procedures in every department of SJMO.

22.     At the time she was discharged, Plaintiff was the only female among three African American officers and one of four female officers in the safety department.

23.     At the time she was terminated from her employment with Defendant, Plaintiff was the only African American among five officers 50 years of age or older, one of two female officers in that age rang, and the only female among five officers at the top pay scale in the department, entitled to a yearly bonus since attaining the maximum pay rate.

24.     During the course of her employment with Defendant Plaintiff received merit raises for performing her duties in a manner that was satisfactory or better and received numerous awards for perfect yearly attendance records until she was injured in an auto accident on her way to work in June 2000.

25.     Throughout the course of her employment with Defendant, Plaintiff was always proactive in her job of providing security inside and around the hospital premises, and was lauded and commended for her diligence and excellence as a safety officer by hospital staff outside of her public safety department, **Exhibit 2**.

26.     Plaintiff's duties as security officer at SJMO included responding to dispatch calls to assist medical staff with difficult patients which can result in injuries to the patient, the staff or the security officer(s) involved and had once led to Plaintiff and two fellow security officers being named co-defendants with a charge nurse and the hospital in a lawsuit for their involvement in a medical assist dispatch call on March 6, 1992 to detain

and prevent a patient from leaving the hospital after the patient had voluntarily come to the hospital to seek help for his condition, **Exhibit 3**.

27.     Plaintiff always followed the guidelines and restraint protocols for medical assists dispatch calls established by SJMO since the 1992 incident.

28.     Throughout Plaintiff's period of employment with Defendant SJMO, the safety department operated three 8-hour shift schedules to provide security 24/7 inside and around the hospital campus with only 15 security officers and two supervisors. As a result of inadequate staffing of the safety department, the officers were required to work 8 hours overtime through the next shift on a regular basis.

29.     Early in 2010, SJMO published a blueprint for its planned expansion of the hospital capacity. The HR Office and the safety department began making plans to meet the expected increase in the security needs of the hospital due to the planned expansion of the hospital capacity and to reduce the amount and cost of overtime in the department.

30.     Rumors and leaks soon began to circulate in the department from the supervisors' inner circle about plans to hire younger officers at entry level pay scale to replace some older officers to eliminate the need for overtime and reduce cost in the department.

31.     On May 19, 2010, Plaintiff became ill at work toward the end of her midnight shift and went to the ER to see a doctor. The ER doctor advised her to go home to get rest. Plaintiff called the shift supervisor, Stephen Kazimer, and informed him of her condition and whereabouts and asked for a vacation day off from her scheduled overtime in the next shift to go home to see her primary doctor and get some rest as the ER doctor advised her to do.

32.    The supervisor told Plaintiff that he did not think she had enough personal time-off (PTO) left in the bank for a vacation day. Appellant said that she had enough PTO time left and that the supervisor should check the record. The supervisor said he would check the record. The supervisor sent another officer to the ER to collect Plaintiff's radio and keys from her.

33.    Before she left to go home, Plaintiff placed the ER doctor's letter to her supervisor in the supervisor's file at the ER Security Post.

34.    When Plaintiff reported back to work after a day off, the supervisor issued a disciplinary action and written warning for insubordination and absenteeism against her for not coming to see him after leaving the ER and not clocking out before going to ER.

35.    Two weeks later, on June 4, 2010, Plaintiff was on exterior mobile patrol in day shift overtime and parked her patrol vehicle on the street to go on foot patrol of two equipment storage buildings owned by the hospital on the residential side of the street on the perimeter of the hospital campus. An elderly lady that lived in a house next to the buildings beckoned Plaintiff over to her front porch to inquire about a mental patient who escaped from the ER building and ran naked past her house a few days earlier.

36.    Someone reported seeing Plaintiff at the front porch to the supervisor. Plaintiff was issued another disciplinary action for misconduct for unauthorized absence from a patrol vehicle, and a final written warning after only a second disciplinary action that put her on a fast track for discharge on the next and third disciplinary action, contrary to the 4-step progressive discipline process provided for in the Public Safety Officers collective bargaining agreement (CBA) between their union, MAP, and SJMO that requires four disciplinary actions within two consecutive years for a discharge.

37.    Plaintiff filed a grievance against the safety department with her union, MAP, seeking to quash and rescind the disciplinary actions and the final written warning. The supervisor, Stephen Kazimer, rejected and returned the grievance and upheld his disciplinary actions against Plaintiff and the union refused to take any further action.

38.    For the next 12 months, Plaintiff came to work every day with extreme anxiety, fearful that the supervisors would issue another disciplinary action against her for any reason any day that would lead to her discharge.

39.    On May 16, 2011, the HR Office and the safety department began to hire new officers, with the addition of two younger white officers. Several more officers younger than Plaintiff were hired within four months of Plaintiff discharge in 2011, **Exhibit 4**.

40.    On June 17, 2011, one month after Defendant SJMO began to hire new officers, Plaintiff was issued a third and final disciplinary action for alleged inappropriate behavior and interaction with a patient and the medical staff during an ER dispatch call medical assist incident on the night of June 16, 2011.

41.    On the night in question, at about 9:47 PM, Plaintiff and two fellow officers responded to an ER dispatch call for assistance with a 4-points restraint of a patient in Room #19 said to be combative, hyper-verbal and threatening to stab staff and to leave.

42.    When the officers arrived at the ER, there was no staff in the patient's room to brief them on the situation with the patient.

43.    In accordance with the SJMO public safety department policy and guidelines requiring officers to be proactive on the job and to evaluate situations and bring to bear measures which will reduce the probability of incidents occurring, Plaintiff went into the patient's room to assess the situation.

44.     A female patient was sitting at the edge of her bed near the foot of the bed fully clothed as if ready to live. The patient looked sad but was not acting up.

45.     In accordance with the SJMO public safety department policy and guidelines requiring that any use of force must be  preceded with a verbal request, unless the aggressor shows clearly by her actions that such a request is futile, dangerous, or untimely, Plaintiff  engaged the patient in a brief dialog to calm her down.

46.      Plaintiff asked the patient what she was in the hospital for and the patient said that she came to the hospital to seek help for a drug problem but that she no longer wished to stay and wanted to leave.

47.     Plaintiff told the patient that she did not know if the patient could leave or not but that if the patient cooperated with the medical staff they may transfer her to the Common Ground drug evaluation center where drugs patients can get all the treatments they need and may join a Narcotics Anonymous rehabilitation group.

48.     Consistent with the SJMO public safety department policy and guideline that when an officer is called to detain or restrain a combative patient, the officer shall expect that medical personnel have adhered to restraint protocols prior to calling the officer, and to be sure officers had proper authority to put the patient in restraints, Plaintiff left the patient's room to find out from the ER staff if the patient was petitioned and certified to be put in restraints ("pit and certed").

49.     Plaintiff encountered ER staff nurse, RN Sonya Moak, in the hallway outside the patient's room. Plaintiff asked the nurse if the patient in room #19 was "pit and certed". The nurse said she did not know but that she would go and find out.

50.     Plaintiff then saw ER staff, RN Mark Bott, headed to Room #19. Plaintiff asked him if the patient in room #19 was "pit and certed". RN Bott asked "why?" Plaintiff said that a patient has to be "pit and certed" to be put in restraint by officers, unless the patient is acting up or is a danger to herself or others. RN Bott would not say a word and simply headed into the patient's room, looking quite upset. Plaintiff and the other officers followed the RN into the patient's room.

51.     The patient was not made aware that ER staff had sent for security to have her put in restraints and was still sitting at the side of her bed. She became visibly anxious when two ER staff and three officers entered her room. She asked to know what was going on.

52.     RN Bott directed the officers to put the patient in restraints and the patient asked to know why she was being put in restraints and said she wished to go home.

53.     RN Bott pushed the patient back down into the bed and told the officers to put her in restraints. The officers put the patient in restraints without any struggle and left.

54.     Before clocking out from her shift at 10:30 PM, Plaintiff filed a Security Incident Report, noting that officers were dispatched to ER Room #19 and that a patient was put in 4-Points Restraint without being ordered at the time to be put in restraint; that the patient stated that she came in for drug problems, but that the patient refused to stay and was placed in restraint without injuries to the patient or staff, **Exhibit 5**.

55.     The ER nurse, RN Bott, filed a PEER's Report complaint against Plaintiff, stating that Plaintiff was summoned to restrain a "pit and certed" patient who was becoming agitated and verbally threatening to leave and to stab staff; that Plaintiff tried to de-escalate the patient but told the patient that she could go if she wasn't suicidal and told the ER nurse that patients here for drugs and alcohol are not psych patients.

10

56.     On June 17, 2011, Plaintiff was notified by the shift supervisor Greg Williams that a PEER's Report complaint was filed against her for inappropriate behavior and interaction with a patient and the staff at a medical assist incident the night before, and requested more information from her about the incident report she filed the night before.

57.     Without seeing the content of the PEER's Report complaint, Plaintiff could not recall any inappropriate behavior or interaction she had with either the patient or the staff. Plaintiff responded to the supervisor's note with minor details she left out of the security incident report: that when she arrived in ER Room #19, the patient was sitting at the side of the bed ready to leave; that she asked staff if the patient was "pit and certed" but no one had a clue if the patient was petitioned; that advised the patient that if she cooperated with staff, they may transfer her to the common ground. **Exhibit 6**.

58.     Supervisor Greg also requested statements about the medical assist incident from the other two officers who responded to the ER dispatch call with Plaintiff, and the Human Resources officer, Ryan Hernandez,  also obtained statements about the incident from ER staff nurses, RN Bott and RN Moak.

59.     RN Bott said in his statement told human resources office that "this security guard intervened without knowing what was going on; I take exception to that" and that he "never had a security guard overstep their boundaries like this", and demanded that "it needed to be addressed".

60.     Officer Pete Kowalak, one of the two officers at the ER during the incident but who was not inside the patient's room when Plaintiff was talking with the patient, stated that he saw Plaintiff discussing with RN Bott whether the patient was "pit and certed" and that RN Bott seemed upset with Plaintiff.

61.     The second officer at the ER scene, Dave Sikorski, who also was not inside the patient's room when Plaintiff talked with the patient said in his statement that he overheard Plaintiff telling the patient that she was free to leave the hospital, and that at some point "the patient grabbed her I.V. and tried to pull it out of her hand" and had to be put in restraint by RN Bott with his and Officer Kowalak's assistance and that Plaintiff did not assist with the restraints.

62.     No one else at the scene besides Officer Sikorski said that the patient was hooked up to I.V. or that the patient grabbed the I.V. and tried to pull out the I.V., or  that Plaintiff did declined to assist in putting the patient in restraint.

63.     Plaintiff was not informed of what others at the scene said and was not given opportunity by the HR Office to confront RN Bott or Mr. Sikorski on their allegations.

64.     On July 1, 2011 Plaintiff was issued a third disciplinary action and terminated from her employment, allegedly for "performing in a manner that causes grave harm and potentially grave harm to the patient and the employer", and "acting outside her scope of duties and advising a patient incorrectly about the patient's ability to leave the premises, thereby exacerbating the patient's behavior in a negative manner that resulted in the patient attempting to pull the I.V. out and requiring the SJMO staff to place the patient in restraints". **Exhibit 7**.

65.     Plaintiff filed a grievance with the MAP union against the disciplinary action and her discharge after a third disciplinary action. The safety department escalated the process from Step 1 to Step 3 of the Grievance Procedure.  Before the Step 3 meeting with the safety department supervisors and other SJMO representatives, the union rep told Plaintiff that "they (SJMO and the safety department) don't want you back".

66.     At the meeting Plaintiff disputed the statements in the discharge document as fabrications because she did not give the patient any clinical advice or tell the patient that she was free to leave; and because the patient was not hooked up to I.V. and was not restrained because she tried to pull out any I.V. from her hand.

67.     The Human Resources office did not bring witnesses at the hearing to dispute Plaintiff's statements or corroborate the allegations in the discharge document.

68.     The employer rejected the grievance and upheld its termination of Plaintiff, but offered Plaintiff a cash settlement of $5000 for her unused vacation time if she would offer to resign instead of being terminated. Plaintiff rejected the offer.

69.     Plaintiff requested the union representative to take her grievance to arbitration but the union rep said there was nothing more the union could do.


COUNT I
AGE DISCRIMINATION
(CLAIM AGAINST DEFENDANTS SJMO, HERNANDEZ, KAZIMER &WILLIAMS)

70.     Plaintiff hereby incorporates by reference paragraphs 1 through 52 and further states as follows:

71.     At all times pertinent, Plaintiff was an employee and Defendant SJMO was an employer covered by and within the meaning of the federal Age Discrimination in Employment Act (ADEA), 29 U.S.C. §621 et seq. and the Michigan Elliott-Larsen Civil Rights Act, MCL 37.2101 et seq.

72.     Plaintiff's age was at least one factor that made a difference in Defendants' decision to terminate Plaintiff from her position as security officer at SJMO.

73.     At the time she was terminated Plaintiff was 51 years of age and the oldest of the three African American security officers in Defendant SJMO's public safety department, the only African American among five officers aged 50 or more years, and one of two female officers aged 50 or more years in the department.

74.     Had Plaintiff been a younger person she would not have been terminated.

75.     Defendants were predisposed to discriminate against Plaintiff on the basis of age and contrived a scheme to terminate her in accordance with that predisposition and terminated her in accordance with that predisposition.

76.     As part of their scheme to terminate Plaintiff for her age, Defendants charged Plaintiff with trumped-up disciplinary actions on May 19, 2010 and June 4, 2010 and gave Plaintiff a final written warning after the second disciplinary action to put her on fast track to be discharged upon the next trumped-up disciplinary action contrary to the collective bargaining agreement (CBA) requirement of a final written warning after a third disciplinary action and a discharge after the fourth disciplinary action.

77.     As part of the Defendant's scheme to terminate Plaintiff for her age, Defendants charged Plaintiff with a major infraction on the third trumped-up disciplinary action on July 1, 2011 on the false and implausible allegation that on June 16, 2011 Plaintiff inappropriately interacted with a patient and the ER staff during an ER medical assist in a manner causing grave harm or potentially grave harm to the patient and SJMO.

78.     The disciplinary actions against Plaintiff had not justifiable basis but were mere pretexts to terminate Plaintiff and allow Defendants to replace her with younger lower paid security officers, which was in fact done.

79.     The above actions of the Defendants violated the rights of the Plaintiff under the ADEA and the Michigan Elliott-Larsen Civil Rights Act.

80.     Defendants' actions were intentional in disregard of Plaintiff's rights and sensibilities.

81.     As a direct and proximate result of Defendant's unlawful actions, Plaintiff sustained injuries and damages including, but limited to, loss of earnings and earning capacity, loss of career opportunities,; humiliation and embarrassment; mental and emotional distress; and loss of the ordinary pleasures of everyday life, including the right to pursue gainful occupation of choice.

        WHEREFORE, Plaintiff requests that this honorable Court enter judgment in favor Plaintiff against the Defendants as follows:

1. An award of lost wages and the value of fringe benefits, past and future, in whatever amount she is found to be entitled;

2. An award of compensatory damages in whatever amount over $250,000 she is found to be entitled;

3. An award of exemplary damages commensurate with the wrong and Defendants' ability to pay;

4. An award of interest, costs, and reasonable attorney fees;

5. An order reinstating Plaintiff to the position she would have held if Defendants had not discriminated against her; and

6. An order awarding whatever other equitable relief the Court deems just and appropriate under the circumstances.

COUNT II
RACE DISCRIMINATION
(CLAIM AGAINST DEFENDANTS SJMO, HERNANDEZ, KAZIMER &WILLIAMS)

82.     Plaintiff hereby incorporates by reference paragraphs 1 through 56 and further states as follows:

83.     This claim is authorized and instituted pursuant to the provisions of Title VII of the Civil Rights Act of 1964, 42 U.S.C. Sections 2000e et seq., as amended, and 42 U.S.C. Section 1981, and the Michigan Elliott-Larsen Civil Rights Act, MCL 37.2101 et seq., for relief based upon the unlawful employment practices of the above-named Defendants. Specifically, Plaintiff complains of Defendants' violation of the statutes' prohibition against discrimination in employment based, in whole or in part, upon an employee's race.

84.     At all material times, Plaintiff is an African American female and during his employment with Defendant SJMO was a member of a class protected under the above statutes against race based discrimination by his employer, Defendant SJMO, or its supervisory personnel.

85.     Plaintiff's race was a factor that made a difference in Defendants' decision to terminate Plaintiff from her employment as a security officer with SJMO.

86.     At all material times, Plaintiff was the only African American among four female security officers in Defendant SJMO's public safety department, the only African American among five security officers of age 50 or more years in the department, and one of two female security officers of age 50 or more years in the department.

87.     As the only African American in her shifts, Plaintiff was often subjected to disparate treatment than her white fellow officers.

88.    In August 2000, after a two-moth disability leave following an auto accident injury sustained on her way to work on June 22, 2000, Plaintiff was not allowed to return to work with a doctor's restriction requiring light duty assignments, even though the SJMO public safety department routinely allowed white officers back on the job with restrictions for light duty assignments after a sick leave, even if doing so required assignment of the officers to a different shift than they were in before their sick leave. In Plaintiff's case, she had to file a complaint with the U.S. Labor Department before she was allowed back to her job.

89.    Throughout Plaintiff's employment at SJMO, Defendants were predisposed to discriminate against Plaintiff on the basis of race and acted in accordance with that disposition to terminate Plaintiff on July 1, 2011.

90.    At the time of her discharge, Plaintiff was one of only 3 African American security officers in the SJMO public safety department, the only African American among five officers 50 years of age or older, and the only African American among five officers at the top pay scale, earning overtime pay based on her top pay scale, plus 10% premium pay in her afternoon and midnight shifts based on her top pay scale, and a yearly bonus since her attainment of the maximum pay scale.

91.    At the time of Plaintiff's discharge, Defendants were in the process of hiring new security officers for safety department, which would also require increasing the number of minority officers in the department to maintain or improve on the current diversity ratio in the department.

17

92.     Defendants motivated to discharge Plaintiff, the one female African American at top pay scale so Defendants could hire more African Americans at the entry level pay scale to at the least maintain the current diversity ratio in the enlarged department.

93.     Had Plaintiff been a white security officer, she would not have been treated in the manner described or charged with the bogus disciplinary actions brought against her and would not have been terminated.

94.     Defendants terminated Plaintiff from her employment with reckless indifference to Plaintiff's rights and sensibilities.

95.     As a direct and proximate result of Defendant's unlawful actions, Plaintiff has sustained injuries and damages including, but limited to, loss of earnings and earning capacity, loss of career opportunities,; humiliation and embarrassment; mental and emotional distress; and loss of the ordinary pleasures of everyday life, including the right to pursue gainful occupation of choice.

WHEREFORE, Plaintiff requests that this honorable Court enter judgment in favor Plaintiff against the Defendants as follows:

1.  An award of lost wages and the value of fringe benefits, past and future, in whatever amount she is found to be entitled;

2.  An award of compensatory damages in whatever amount over $250,000 she is found to be entitled;

3.  An award of exemplary damages commensurate with the wrong and Defendants' ability to pay;

4.  An award of interest, costs, and reasonable attorney fees;

5. An order reinstating Plaintiff to the position she would have held if Defendants had not discriminated against her; and

6. An order awarding whatever other equitable relief the Court deems just and appropriate under the circumstances.

COUNT III
SEX DISCRIMINATION
(CLAIM AGAINST DEFENDANTS SJMO, HERNANDEZ, KAZIMER &WILLIAMS)

96. Plaintiff hereby incorporates by reference paragraphs 1 through 81 and further states as follows:

97. At all material times, Plaintiff was an employee and Defendant SJMO was an employer covered by and within the meaning of Title VII of the Civil Rights Act of 1964 (Title VII), as amended and the Michigan Elliott-Larsen Civil Rights Act (MCRA).

98. Plaintiff is a member of a class protected under Title VII against gender based discrimination by her employer, SJMO.

99. Plaintiff's gender was a factor that made a difference in Defendants' decision to terminate Plaintiff from her employment as a security officer at SJMO.

100. At all material times, Plaintiff was the only female among five security officers at the top pay scale in the SJMO public safety department.

101. Defendants being of the same gender were predisposed to discriminate on the basis of sex and acted in accordance with that disposition.

102. Defendants singled Plaintiff out for termination among the five security officers at top pay scale in their public safety department because of her gender as a female.

103.    Had Plaintiff been a white male, she would not have been treated in the manner described.

104.    As a direct and proximate result of Defendant's unlawful actions, Plaintiff has sustained injuries and damages including, but limited to, loss of earnings and earning capacity, loss of career opportunities,; humiliation and embarrassment; mental and emotional distress; and loss of the ordinary pleasures of everyday life, including the right to pursue gainful occupation of choice.

WHEREFORE, Plaintiff requests that this honorable Court enter judgment in favor Plaintiff against the Defendants as follows:

1.   An award of lost wages and the value of fringe benefits, past and future, in whatever amount she is found to be entitled;

2.   An award of compensatory damages in whatever amount over $250,000 she is found to be entitled;

3.   An award of exemplary damages commensurate with the wrong and Defendants' ability to pay;

4.   An award of interest, costs, and reasonable attorney fees;

5.   An order reinstating Plaintiff to the position she would have held if Defendants had not discriminated against her; and

6.   An order awarding whatever other equitable relief the Court deems just and appropriate under the circumstances.

COUNT IV
INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONSHIP
(CLAIM AGAINST DEFENDANTS MARK BOTT AND DAVE SIKORSKI)

105.    Plaintiff hereby incorporates by reference paragraphs 1 through 99 and further states as follows:

106.    At all material times, Plaintiff was covered by an express contractual relationship for continued employment entered into on her behalf between her union, MAP, and Defendant SJMO.

107.    At all times relevant Defendants Mark Bott and Dave Sikorski knew and/or should have known of the existence of the aforementioned contractual relationship between Defendant SJMO and Plaintiff Anita Loyd.

108.    As set forth herein Defendant Bott and Defendant Sikorski falsely gave false statements to Defendant SJMO and its agents and/or supervisory personnel implicating Plaintiff in inappropriate behavior and interaction with a patient and medical staff and/or incorrectly advising a pit and certed patient that she was free to leave the hospital, and/or exacerbating the patient behavior in a negative way, causing  the patient to grab the I.V. on her hand and attempt to pull the I.V. out and causing the patient to be put in restraints.

109.    By their false statements, Defendants Bott and Sikorski induced Defendant SJMO to not honor and perform its contractual obligations in general, and to terminate Plaintiff Loyd's employment in particular.

110.    The above named Defendants' intentional interference with the aforementioned contractual relationship was based malice, prejudice and/or self-serving motives, objectives, and desires.

111.   The above named Defendants' intentional interference with the aforementioned contractual relationship was a direct and proximate cause of the injuries, damages and harm suffered by Plaintiff Loyd.

112.   Because the Defendants' conduct towards Plaintiff Loyd was improperly motivated, and was malicious, intentional, willful and wanton, Plaintiff is entitled to punitive/exemplary damages in addition to compensatory damages.

WHEREFORE, Plaintiff requests that this honorable Court enter judgment in favor Plaintiff against the Defendants as follows:

1.   An award of lost wages and the value of fringe benefits, past and future, in whatever amount she is found to be entitled;

2.   An award of compensatory damages in whatever amount over $250,000 she is found to be entitled;

3.   An award of exemplary damages commensurate with the wrong and Defendants' ability to pay;

4.   An award of interest, costs, and reasonable attorney fees;

5.   An order reinstating Plaintiff to the position she would have held if Defendants had not discriminated against her; and

6.   An order awarding whatever other equitable relief the Court deems just and appropriate under the circumstances.

## COUNT V
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### (CLAIM AGAINST ALL DEFENDANTS)

113.    Plaintiff hereby incorporates by reference paragraphs 1 through 107 and further states as follows:

114.    As set forth herein, during her employment with Defendant SJMO, Plaintiff was subjected to a pattern of discrimination and misconduct in the workplace based, in whole or in part, on her age, race, and/or gender.

115.    At all relevant times, the above named Defendants knew and/or should have known that Defendants' Bott and Sikorski's accusations against Plaintiff Loyd were false. Despite said knowledge, Defendants ignored the evidence and accepted the false accusations as true.

116.    Despite actual and/or constructive knowledge that the accusations were false and unfounded, Plaintiff Loyd was written-up and disciplined for alleged infractions of company policy, and was terminated from her employment.

117.    The above named Defendants by disciplining Plaintiff Loyd for alleged infraction of the employer's policy and terminating her employment, acted intentionally, recklessly and/or with deliberate indifference to the substantial probability that severe emotional distress would result to Ms. Loyd.

118.    The above-named Defendants' actions towards the Plaintiff as set forth above are evidence of a pattern of age, race and/or gender discrimination which further constitutes extreme and outrageous conduct.

119.   The conduct of the above-named Defendants was outrageous in character and extreme in degree, because said conduct was atrocious and egregious, and went beyond all possible bounds of decency and is utterly intolerable in a civilized community.

120.   The extreme and outrageous conduct of the above-named Defendants toward Plaintiff Loyd was done in a willful and wanton manner, and constituted a disregard for the rights and well-being of Plaintiff Loyd.

121.   As a direct and proximate result of the above-named Defendant's extreme and outrageous conduct, Plaintiff Loyd suffered severe emotional distress.

122.   Because the Defendants' extreme and outrageous conduct toward Plaintiff Loyd was improperly motivated, and was intentional, malicious, willful and wanton, Plaintiff Loyd is entitled to punitive/exemplary damages in addition to compensatory damages.

WHEREFORE, Plaintiff requests that this honorable Court enter judgment in favor Plaintiff against the Defendants as follows:

1.   An award of lost wages and the value of fringe benefits, past and future, in whatever amount she is found to be entitled;

2.   An award of compensatory damages in whatever amount over $250,000 she is found to be entitled;

3.   An award of exemplary damages commensurate with the wrong and Defendants' ability to pay;

4.   An award of interest, costs, and reasonable attorney fees;

5.   An order reinstating Plaintiff to the position she would have held if Defendants had not discriminated against her; and

6.  An order awarding whatever other equitable relief the Court deems just and appropriate under the circumstances.

Respectfully submitted,

s/ Joseph T. Ozormoor (P42462)        .
Attorney for Plaintiff
469 LaBelle Road
Grosse Pointe Farms, MI 48236
TEL: (313) 949-2656
Fax:  (313) 432-7840
Dated June 13, 2012                jtozormoor@comcast.net

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

ANITA LOYD
  Plaintiff
v.              Case No:
               HON:

ST JOSEPH MERCY OAKLAND/TRINITY HEALTH
RYAN HERNANDEZ, SJMO Human Resources Officer
STEPHEN KAZIMER, SJMO Security Supervisor
MARK BOTT, SJMO ER-Nurse
DAVE SIKORSKI, Public Safety Officer

  Defendants

_____  _____/

### DEMAND FOR JURY

   Plaintiff ANITA LYOD hereby demands a jury for the trial of her above causes of

action.

            Respectfully submitted,

            s/ Joseph T. Ozormoor (P42462)
            Attorney for Plaintiff
            469 Labelle Road
            Grosse Pointe Farms , MI 48236
            TEL: (313) 949-2656
            Fax:  (313) 432-7840
Dated June 13, 2012       jtozormoor@comcast.net